**In re William L. SEWELL and Dorothy J. Sewell, Debtors.**

**Ed. W. HARWELL, as Trustee, Plaintiff,**

**v.**

**FIRST NATIONAL BANK OF WETUMP-KA, ALABAMA, William L. Sewell and Dorothy J. Sewell, Defendants.**

**Bankruptcy No. 81–03997.
AP No. 82–0220.**

United States Bankruptcy Court,
N.D. Alabama.

July 18, 1983.

Ed W. Harwell, Anniston, Ala., trustee, In re Sewell.

William H. Broome, Anniston, Ala., for the Sewells.

Alan D. Levine, Birmingham, Ala., for First Nat. Bank.

Myron Allenstein, Gadsden, Ala., for Finance America.

Charles Martin, Gadsden, Ala., for Morgan.

Martha Roper, Albertville, Ala., trustee, In re Morgan.

Robert B. Rubin, Birmingham, Ala., for Citicorp Acceptance Co., Inc.

J. Richard Carr, Gadsden, Ala., for the Hardins.

### FINDINGS OF FACT AND CONCLUSIONS BY THE COURT

L. CHANDLER WATSON, Jr., Bankruptcy Judge.

*Introduction —*

Each of the first two of the above-styled cases (hereinafter referred to, respectively,

as "Sewell" and "Morgan") was commenced by a voluntary petition filed in this Court under title 11, United States Code, chapter 7, and continues to be pending before this Court under said chapter. The third of the above-styled cases (hereinafter referred to as "Hardin") was commenced by a petition filed in this Court under title 11, United States Code, chapter 13, and continues to be pending before this Court under said chapter. The petition in each case was filed after September 30, 1979. Matters and proceedings in the case, therefore, are governed by the provisions of the Bankruptcy Reform Act of 1978, Public Law 95–598.

Each of these cases involves the common question of whether a creditor's purchase-money security interest in a mobile home of the debtor or debtors, created under a duly executed security agreement, is a *perfected* security interest under the provisions of the Alabama *Uniform Commercial Code.*[1]

### Findings of Fact

*The Sewell Case —*

In the Sewell case, most of the facts may be gleaned from the three sets of alleged facts filed in this case, respectively, by the trustee in bankruptcy (Ed. W. Harwell, Esquire, hereinafter generally referred to as the "trustee"), the First National Bank of Wetumpka, Alabama (hereinafter generally referred to as the "bank"), and the debtors (William L. and Dorothy J. Sewell, hereinafter generally referred to as the "debtors"). A much-earlier motion for summary judgment, filed by the bank, having been overruled, and there not being complete confession of all relevant facts, a trial was held upon the few remaining facts, before the bankruptcy judge, without the intervention of a jury. From the facts assumed by all parties or admitted and from the evidence presented to the Court in the Sewell case, the bankruptcy judge finds the facts to be as follows:

1. On April 6, 1974, the debtors purchased from "Mobilerama" one new 1974 model "Vagabond" mobile home, being 65 feet long and 24 feet wide and having four bedrooms and a central air conditioner. The sale price (including sales taxes) was $11,088.41. The debtors paid a down payment of $1,200.00. The balance of the purchase price, property insurance for 84 months, and recording fees totaled $10,891.70, to which were added finance charges (at an annual percentage rate of 12.78%) of $10,454.86, for a total of $21,346.56. On the date of purchase, the debtors signed a promissory note and security agreement in favor of the seller, which provided for the debtors' payment of said sum of $21,346.56 in 144 consecutive monthly installments of $148.24 each, commencing May 21, 1974, and which granted to the seller a security interest in said mobile home, to secure the payment and performance of the debtors' obligations under this instrument. This contract, shortly, had been successively assigned to Transport Acceptance Corporation and to First National Bank, Wetumpka.

2. In connection with this sale, a financing statement which described said mobile home was filed for record in the office of the Probate Judge of Calhoun County, Alabama, on April 16, 1974. No "continuation statement" was filed for the purpose of extending the term of effectiveness of said financing statement.

3. Said mobile home was a prefabricated dwelling house which was designed to be movable to a semipermanent residence site and successively thus moved, unless affixed by independent means to a particular site in such manner as to render infeasible its being moved. It was not designed to be readily towed by an automobile or other vehicle over the highways from one temporary site to another, as in the fashion of a "travel trailer."

4. Said mobile home was purchased for use as a family dwelling and has been thus used during the time since its purchase and has been moved once (from one dwelling site to another) after being placed at its initial dwelling site. At the time of trial,

---

1. See Code of Ala., Tit. 7A, Article 9, "Secured Transactions ..." (recompiled 1958; 1966 added volume); Code of Alabama 1975, Tit. 7, Article 9, "Secured Transactions ...."

said mobile home sat on cement blocks and was tied down for protection against wind storms. It had a connecting front porch and back porch but was not attached to either, and the mobile home could still be moved to a different dwelling site.

5. At the time of the filing of the debtors' petition, July 9, 1981, the sum of $8,000.00 was claimed by the bank to be still owed on the purchase contract or note. In Schedule B–4 to their bankruptcy petition, the debtors claim said mobile home to be exempt from their bankrupt estates.

*The Morgan Case* —

In the Morgan case, the mobile home in question was not claimed by the debtor, J.C. Randall Morgan, Jr. (hereinafter generally referred to as the "debtor"), as exempt from the estate, and the debtor, who evidences no interest in the mobile home, has been dismissed as a party defendant. This leaves the mobile home subject to the conflicting claims of the plaintiff, Finance America Credit Corporation (hereinafter generally referred to as "FinanceAmerica") and the trustee in bankruptcy, Martha T. Roper, Esquire (hereinafter generally referred to as "trustee"). They agree upon the controlling facts in this proceeding, as hereinafter detailed, and they have requested the Court to adjudicate their conflicting interests to the mobile home, as if this proceeding had been submitted upon opposing motions for summary judgment. In accordance with the requests of the parties, the bankruptcy judge finds from the pleadings and statements of counsel that the facts in this proceeding are as follows:

1. The debtor and Jo Ann Morgan entered into a "Credit Sales Agreement" with Walker County Mobile Homes, Inc., dated April 22, 1976, whereby, the latter sold, and the former purchased, one new 1976 model Marion "Jamaica" mobile home, being 65 feet long and 12 feet wide, at a sale price of $8,970.90, on which a down payment of $897.00 was made. After finance charges of $6,951.20 (at an annual percentage rate of 13.11%) and other charges were added, the contract provided for the purchasers to pay to the seller $15,639.60 in 120 successive monthly installments of $130.33 each, commencing June 6, 1976. Under date of April 26, 1976, the seller assigned the contract to FinanceAmerica.

2. On May 17, 1976, a financing statement which described the mobile home and which was executed by the debtor and Jo Ann Morgan and the seller was filed in the office of the Probate Judge of Marion County, Alabama.

3. No "continuation statement", to extend the effective term of the financing statement, had been filed by the time of the commencement of this bankruptcy case, on October 25, 1982.

4. Said mobile home was property of the type described in paragraph No. 3 of the Findings of Fact in the Sewell case.

5. FinanceAmerica claims a purchase-money security interest in said mobile home as security for the payment of the undisclosed balance remaining unpaid on the "Credit Sales Agreement," which indebtedness was listed in the debtor's schedules as being $6,298.76.

6. What interest, if any, Jo Ann Morgan may have in the mobile home is undisclosed.

*The Hardin Case* —

In the Hardin case, Citicorp Acceptance Company, Inc. (hereinafter generally referred to as "Citicorp") filed, on March 21, 1983, a "MOTION FOR RE–HEARING" [*sic*], praying that the Court allow Citicorp "to file a claim representing the full balance currently due … of $34,340.24, in lieu of the claim in the amount of $13,055.63 filed in this case, and that said substitute claim be allowed as a secured claim and reasonable fixed payments be set by the Court to be paid directly to" Citicorp. After notice given to Citicorp, its attorneys, and other parties in interest, a hearing upon this motion was held before the Court at Gadsden, Alabama, on April 20, 1983. After considering the pertinent facts, which are not in dispute and the applicable law, the bankruptcy judge announced that Citicorp's motion was denied, and these matters are now to be committed to writing. From Citicorp's motion and the attachments to it

and from the case file, the bankruptcy judge finds that the undisputed facts in this case are as follows:

1. The debtors, James H. Hardin, Jr., and Vickie A. Hardin (hereinafter generally referred to as the "debtors") filed this "chapter 13 case" on November 18, 1982; whereupon, the United States trustee called a meeting of creditors, and the Court set a hearing upon the matter of confirming the debtors' chapter 13 plan, both to be held on December 8, 1982, and the clerk of the Bankruptcy Court gave written notice of these and other matters pertaining to the case to the listed creditors, including Citicorp, by means of a notice mailed November 29, 1982.

2. After the meeting of creditors, the case came on to be heard before the Court on December 8, 1982, with the debtors, their attorney, the standing chapter 13 trustee, and a representative of another creditor present.

3. On January 7, 1983, the Court entered an order confirming the debtors' plan and providing for the trustee to make payments of $60.00 each month to Avco Financial Services Company on the only allowed secured claim, as determined by the Court; and, on said date, the Court issued an order to the employer of one of the debtors to deduct from that debtor's wages $72.00 each week and remit the same to the trustee, for implementation of the confirmed plan. The confirmed plan and the Court's confirmation order combined to provide for payment in full of the secured claim in not more than 36 months and for payment in full of all allowed unsecured claims, on a pro rata basis and in not more than 60 months.

4. At the time of the confirmation hearing, on December 8, 1982, Citicorp had filed two proofs of claim, which purported to reject the debtors' plan. These were claims No. 6, for "$13,055.33 actuarial [sic] payoff," and No. 5, for "$717.00, arrearage only."

5. Each proof of claim had attached copies of an "ALABAMA MOBILE HOME RETAIL INSTALLMENT CONTRACT" dated September 30, 1981, which purported to cover a purchase by the debtors of their mobile home (described as a new 1982 Guerdon "Renegade" mobile home, being 60 feet long and 14 feet wide, with refrigerator, stove, and air conditioner) from Coosa Valley Mobile Homes, Inc. The reverse of this contract shows what may be taken to be an incomplete assignment of the contract to Citicorp's predecessor. The contract recites a purchase price of $13,172.50, with a down payment of $1,500. Finance charges of $23,731.32 (at an annual percentage rate of 19%) and other charges bring the balance owed to $35,426.37, which the debtors committed themselves to pay to the seller in 180 consecutive monthly installments of approximately $196.00 each, commencing in November, 1981.

6. Also attached to the proofs of claims are copies of another instrument which lists the debtors as "Debtor(s)" and Citicorp's predecessor as "Secured Party," but the copies reflect no signature upon the instrument. At the top of the instrument is a recitation that it is a financing statement presented for filing pursuant to the "Uniform Commercial Code". In a box for indication of date, time, number, and filing office, the only legible writings or figures are "State of Ala." and "1981 OCT 13 AM." This instrument contains a description of the debtors' mobile home listed in their chapter 13 statement. Near the foot of the instrument the following appears: "TERMINATION STATEMENT: This Statement of Termination of Financing is presented to a Filing Officer for filing pursuant to the Uniform Commercial Code. The Secured Party certifies that the Secured Party no longer claims a security interest under the financing statement bearing the file number shown above." Under this statement is a printed place to enter a date, which was left blank, and a printed place for the signature of the secured party or assignee of record, which was left blank, together with the following statement: "Not Valid Until Signed."

7. On March 21, 1983, contemporaneously with the filing of its motion, Citicorp

filed an additional proof of claim form, which shows Citicorp's claim to be in the amount of $34,340.24. Here, a different printed proof of claim form was used which has no printed indication of whether the creditor, if holding a secured claim, accepts the debtors' plan, and nowhere does the proof of claim purport to indicate the creditor's position on acceptance of the plan. Attached to the proof of claim form is a copy of the previously-mentioned contract for purchase of the mobile home, together with a copy of a financing statement which purports to perfect the security interest of Citicorp's predecessor, by showing that the financing statement was filed in the office of the Probate Judge of Etowah County, Alabama, on October 13, 1981.

8. Said mobile home was property of the type described in paragraph No. 3 of the Findings of Fact in the Sewell case.

*All three cases* —

In each case, no question was raised as to whether the financing statement was filed in the proper filing office [*Code of Alabama,* 1975, § 7–9–401(1)]. Because it was assumed by the parties that the place of filing was "in the county of the debtor's [or debtors'] residence," the bankruptcy judge so finds.

### Conclusions by the Court

As will be clearer further in these conclusions, a decision in each of these matters rests upon a proper answer to the question of whether or not the holder of a "purchase-money security interest" in a mobile home holds a *perfected* security interest in the collateral, without regard to whether a related "financing statement" has been properly filed for record. All parties agree that this question is to be answered by an interpretation of the section of the Alabama *Uniform Commercial Code,* dealing with the subject of "[w]hen filing is required to perfect security interest . . . ." The Alabama version of the *Uniform Commercial Code* first became effective at midnight Decem-

ber 31, 1966.[2] This statute is identified as Title 7A and is to be found in Volume 3A, *Code of Alabama,* 1966 added volume. The section dealing with the subject here is section 9–302, which states, in subsection (1), that "[a] financing statement must be filed to perfect all security interest except . . ." those described in the subparts of subsection (1) which follow that statement. Subpart (d) contains the exception which all of the parties agree is to be construed by the Court. The applicable portion of it states *an exception* which is then *qualified by an exception,* as follows: "a purchase money security interest in consumer goods; but filing is required . . . for a motor vehicle required to be licensed." All parties agree that the mobile homes involved here constitute "Goods," as defined in Section 9–105(1)(f) and constitute "consumer goods," as broadly defined in Section 9–109(1); and they further agree that each creditor's interest in the related mobile home was a "purchase money security interest," as defined in Section 9–107(a).

These provisions were carried forward, without change, into *Code of Alabama 1975,* where the sections are identified, in the sequence above, as Sections 7–9–302, 7–9–105, 7–9–109, and 7–9–107. In the Sewell and Morgan cases a further provision somewhat less directly involved, deals with "duration of filing" or the period of effectiveness of a filed financing statement. This was provided for in the original Code compilation in Section 9–403(2) and in the 1975 publication in Section 7–9–403.

The legislature of Alabama made no change in the provisions of the *Uniform Commercial Code* applicable to the decisions in these cases until the year 1981, when it adopted a lengthy amendment,[3] which did not become effective until February 1, 1982.[4] The 1981 revision appears to have made only one change which is important to this consideration. In the exception to the exception stated in Section 7–9–302, the

2. 1965 Ala. Acts, No. 549.

3. 1981 Ala. Acts, No. 81–312.

4. "[N]ew U.C.C.," § 7–11–101; 1981 Ala. Acts, No. 81–312.

term "motor vehicle required to be *licensed*" was changed to "motor vehicle required to be *registered*." (emphasis added).

In the Sewell and Morgan cases, a financing statement was properly filed in each case, with regard to the creditor's security interest in the mobile home in that case. In the Sewell case, the financing statement was filed April 16, 1974, and the voluntary liquidation case in the bankruptcy court was commenced July 9, 1981, more than *seven years* later. In the Morgan case, the corresponding dates were May 17, 1976, and October 25, 1982, the latter date being more than *six years* after the former.

In general, the Alabama *Uniform Commercial Code* has provided in the past, and it continues to provide, that a filed financing statement has a duration of five years, unless extended by a timely-filed "continuation statement."[5] Since none was filed, the financing statement in each case lapsed, and the security interest became unperfected, unless it was perfected without filing a financing statement. If unperfected, the creditor's security interest was subordinate to the rights of the trustee in bankruptcy, which are those of a lien creditor, without knowledge of the creditor's security interest.[6] *Uniform Commercial Code* § 7–9–301(1) is not as clear as desirable in regard to this, where the security interest was once perfected but has lapsed into unperfection. It states that "an unperfected security interest is subordinate to the rights of . . . a person who becomes a lien creditor *before* the security interest is perfected." (emphasis added). With reference to a person who became a lien creditor *after* the security interest was originally perfected but *after* it had lapsed into unperfection, this provision should be read to mean ". . . becomes a lien creditor before the security interest is

. . ." *reperfected,* or it offers no protection to one who checks the records, finds no currently-perfected security interest in a piece of property, and lends money or extends credit upon such property as collateral.

In the Sewell and Morgan cases, neither creditor had an effective financing statement on file at the time of the commencement of the bankruptcy case involved, that being the time when the trustee's status as a "lien creditor" came into being.[7] Unless the creditor's security interest was perfected without filing a financing statement, the creditor's security interest was unperfected and subordinate to the rights of the bankruptcy trustee, who will prevail in the contest over the mobile home.

In the Hardin case, the creditor did not dispute the continued applicability of Bankruptcy Rule 13–302 to the filing of secured claims in Chapter 13 cases. Section 405(d) of the Bankruptcy Reform Act of 1978,[8] provides that the bankruptcy rules in effect on September 30, 1979, apply to this case ". . . to the extent not inconsistent with the amendments made by this Act, or with this Act. . . ." This Court discovered no substantial or controlling inconsistency and applied Rule 13–302 in this case.[9]

In paragraph (c), Bankruptcy Rule 13–302 provides that "[i]f a security interest is claimed, the proof of claim shall be accompanied by satisfactory evidence that the security interest has been perfected." In paragraph (e)(1), the rule states that "[a] secured claim . . . must be filed before the conclusion of the first meeting of creditors in the . . . case . . . ." It further provides that "[a]ny claim not properly filed by the creditor within such time shall not be treated as a secured claim for purposes of . . . distribution in the . . . case."

---

5. Code of Ala.1975, § 7–9–403, or the 1981 amendment [1981 Ala. Acts, No. 81–312], effective February 1, 1982.

6. *See* Code of Ala.1975, § 7–9–301, before and after the 1981 amendment (1981 Ala. Acts, No. 81–312), and 11 U.S.C. § 544(a). The latter section overrides a provision concerning prior knowledge by the creditors represented, which

was contained in the State statute prior to the 1981 amendment.

7. *Id.*

8. Pub.L. 95–598 (1978).

9. See *In re Landers,* 28 B.R. 101 (Bkrtcy.N.D. Ala., 1983).

Citicorp filed its proofs of claim "within such time", but they were totally deficient in complying with the requirement that they be "accompanied by satisfactory evidence that the security interest [had] been perfected," if it was necessary that a financing statement be filed. At the time of the confirmation hearing, which followed the creditors' meeting, and at the time of entry of the order of confirmation, the claims were considered by the Court to be unsecured claims and were so treated. It was some two and one-half months later that Citicorp filed its consolidated proof of claim (showing a properly filed financing statement) and filed its motion which was denied. It is in this setting that Citicorp says that its security interest was perfected without the filing of a financing statement and that its original proofs of claim were adequate to show perfection of its security interest and were due to have been allowed as secured claims.

We thus come to the determinative question in each case: was a purchase-money security interest in a mobile home excepted from the general requirement of *U.C.C.* § 7–9–302 that "[a] financing statement must be filed to perfect all security interests...." If this question is answered in the affirmative, as contended by these creditors, it makes no difference that in the first two cases the financing statements expired or that in the chapter 13 case the proofs of claim were not accompanied by

*satisfactory evidence* of *perfection* by the filing of a financing statement (since copies of the installment-purchase contract were attached).

For simplification, it may be said that, at the times involved in these three cases, Alabama law and bankruptcy law directed that a financing statement be properly filed in regard to a purchase-money security interest in "a motor vehicle required to be licensed," for the security interest to be perfected and thereby enforceable against a bankruptcy trustee or to provide the foundation for a secured claim. In the same vein, was the mobile home in each case "a motor vehicle required to be licensed," thereby triggering the requirement that a financing statement be properly filed if the security interest were to be deemed perfected? The latter question may be divided into two parts.

First, was the mobile home a "motor vehicle"? Certainly not, in the literal sense— no motor. But the term is not used in a literal sense; rather, it is used in a statutory manner—a fact demonstrated by consideration of the term "required to be licensed," referring to a requirement which would be imposed by a statute.

In the statutory sense, a mobile home is, arguably, classified as a "motor vehicle" by the revenue laws of Alabama and certainly classified as a "motor vehicle" by the title-certificate statutes of the State.[10] The

10. The revenue statutes [Ala.Code, Tit. 51, §§ 692–717(1) (Recomp.1958, Supp.1973); Ala. Code §§ 40–12–240 to –271 (1975)] indicated— as might be expected—that they were crafted solely for the purposes of the revenue system and not with the provisions of *U.C.C.* § 9–302(1) in mind, and they appeared to exhibit some lack of certainty in classification of a mobile home as a "motor vehicle." In § 692 of title 51 [§ 40–12–240], the definitions of "[h]ouse trailer," "[m]otor vehicle," "[s]emitrailer," "[t]railer," and "[v]ehicle" were broad enough to include a mobile home within the term "motor vehicle." The term "house trailer" apparently includes "mobile home." Section 704(1) of title 51 [§ 40–12–255], which provided for payment of an annual *registration* fee for "house trailers" and that an identification tag of the same size and design as license tags (to be furnished to the owner) was to be displayed on "the back of the trailer," however,

referred to payment of the fee to the "same county official who issue[d] motor vehicle license tags" and to the fee as being "delinquent at the same times that motor vehicle license taxes [were]," indicating that a "house trailer" was not within the general classification of "motor vehicles." Pointing to the contrary, however, the entire "article" of the revenue code dealing with all of these types of property is titled: "Motor Vehicles."

The reference in the title-certificate statutes is found in Ala.Code, tit. 36, § 167(i)(2) (Recomp. 1958, Supp.1973) or Ala.Code § 32–8–2(9)(b) (1975). Although defined as a "motor vehicle," § 169(i) [or § 32–8–31(9)] exempts mobile homes and certain other "motor vehicles" from the provisions of the title-certificate provisions of the statutes. The title-certificate statutes were made applicable to affected motor vehicles of the "1975 year model, and all models

term is not defined in the *Uniform Commercial Code* or in any other Alabama statute as far as the Court is aware, except title 36, § 1(21), *Ala.Code* (Recomp.1958) [or § 32–1–1(20), *Ala.Code* (1975)]. There, "motor vehicle" is defined as: "[e]very vehicle, as herein defined, which is self-propelled." The irrelevance of this definition to the present consideration is indicated by the caption of title 32 of the 1975 *Ala.Code,* in which the definition appears: "MOTOR VEHICLES AND TRAFFIC." [11] The Court concludes that a mobile home is a "motor vehicle" as that term is used in *U.C.C.* § 9–302.

No one should gag upon this statutory legerdemain, for it is more a bit of legislative shorthand than sleight of hand to classify a mobile home (a movable dwelling house) as a "motor vehicle." Professors White and Summers have detailed a similar instance where *Uniform Commercial Code* § 9–109(1) [12] defines "consumer goods" by a use test which includes a mobile home used as a dwelling house.[13] They note the problem which the trustee in bankruptcy and the referee had in *In re Sprague* [14] with classifying a mobile home as "consumer goods," since it was a large and expensive item and would not be "consumed" as quickly or fully as items typically considered "consumer goods." There the Court was able to find that a mobile home was a "motor vehicle," [15] but not consumer goods, despite the clear command of *U.C.C.* §§ 9–105(1)(f) and –109(1).

Second, was the mobile home "required to be licensed"? The Court considers a possible negative answer to this question to be the most substantial basis for the position of the creditors in the three cases here. The answer to this question has two principal facets.

First, the laws of Alabama provided that a mobile home was a motor vehicle required to be "registered." [16] Thus, a mobile home was not literally a motor vehicle required to be "licensed," as stated in *U.C.C.* § 9–302 (or § 7–9–302).

Second, the *U.C.C.* amendments by the Alabama Legislature in the year 1981, as previously noted, changed the word "licensed" in § 7–9–302 to "registered," effective February 1, 1982. Considering this second aspect first, why did the legislature make this change, which seems to remove any doubt that, after its effective date, filing would be required to perfect a purchase-money security interest in a mobile home? The Alabama Legislature does not keep or publish a legislative history of acts passed; so the matter is left to speculation. It may have been thought that the statutory exception to the exclusion from the filing requirement of *U.C.C.* § 9–302(1) did not cover mobile homes and that this was (1) an oversight or error needing correction or (2) an intentional omission which should be reversed as a matter of policy. It may, otherwise, have been thought that mobile homes were covered by the exception but that the doubt introduced by use of the word "licensed" instead of the word "registered,"

subsequent thereto." § 168 [or § 32–8–30]. Section 185 [or § 32–8–61] and related sections provided for perfection of security interests in affected motor vehicles by application to the Department of Revenue for a lien notation on the certificate of title for the vehicle, instead of the filing of a financing statement required under *U.C.C.* § 9–302 [or 7–9–302].
For a general discussion and holding that a mobile home was a "motor vehicle" under the New York *U.C.C.,* see *Albany Discount Corp. v. Mohawk Natl. Bank,* 28 N.Y.2d 222, 321 N.Y. S.2d 94, 269 N.E.2d 809 (1971).

11. The earlier Code section is in title 36, which mainly deals with motor vehicles and traffic regulations, although merely entitled: "Motor Vehicles."

12. Ala.Code § 7–9–109(1) (1975).

13. White & Summers, Uniform Commercial Code 923–24 (2d ed. 1980).

14. 4 U.C.C. 702 (B.C.N.D.N.Y.1966).

15. On appeal of a companion case, the district court accepted this holding while ignoring the other. *In re Vinarsky,* 287 F.Supp. 446 (N.D.N. Y.1968).

16. Ala.Code, Tit. 51, § 704(1) (Recomp.1958, Supp.1973); Ala.Code § 40–12–255 (1975).

used in the revenue statute, should be eliminated in the course of enactment of the 1981 *U.C.C.* amendments. Also (as previously discussed), by this time, the title-certificate statutes of Alabama governed the perfection of security interests in all "motor vehicles," with certain exceptions—"mobile homes" being specifically excepted. The conforming change does not, therefore, appear significant in resolving the question of interpretation of the statute as it previously read, unless it is argued that purchase-money security interests in "mobile homes" were about all left for operation of the provisions of *U.C.C.* § 9–302(1)(d) and that this section should be made to conform specifically with the terminology of the revenue statute dealing with "house trailers." [17]

This leads back to the initial aspect of the wording of the Alabama *U.C.C.* § 9–302(1)(d) [or § 7–9–302(1)(d)], where the word "licensed" is used instead of "registered"—the word used in the revenue statute. Do the words refer here to the same thing, or does the choice of the word "licensed" evidence a legislative intent to exclude mobile homes from the filing requirement?

Inquiry as to the *meaning* of a statute focuses on how the statute is understood by members of the public to whom it is addressed.[18] In an inquiry as to the *intent* of a statute the primary emphasis is on what the statute meant to the members of the legislature which enacted it.[19]

Where *meaning* of the statute is taken as the criterion for decision it is generally difficult to concentrate on mental images of members of the public and great emphasis should be placed upon conventional or dictionary meaning.[20] Where legislative *intent* is the controlling criterion, the Court should look to specific and direct evidence in legislative history to interpret the statute.[21]

The Court is aided in determining what "meaning" was placed on the statute in question by members of the public to whom it was addressed by the fact that each of the creditors gave evidence of having filed a financing statement on the mobile home in which it claimed a purchase-money security interest. The Court also notes from experience that it is common practice to file a financing statement to perfect such a security interest in a mobile home in Alabama.

If legislative "intent" is used as the criterion for interpreting the statute, the Court is hampered by the fact previously mentioned that the Alabama legislature does not publish or keep a legislative history of the acts passed.

While there are discernable differences in the dictionary definitions of "license" and "register",[22] the practicalities of the matter indicate that in Alabama "licensing" and "registering," except for the subject matter, are procedural equivalents.[23] On the other hand, several revenue statutes which deal with motor vehicles of the types customarily used on or over the public streets and highways use both terms "registered" and "licensed," or substitute terms. Section 692(1) [§ 40–12–241] covers station wagons, jeeps, etc., classified as passenger automobiles, § 693 [§ 40–12–242] covers private passenger automobiles and motorcycles, § 694 [§ 40–12–245] covers jitney buses, § 695 [§ 40–12–246] covers motor buses, § 696 [§ 40–12–247] covers hearses and ambulances, § 697 [40–12–248] covers trucks or truck tractors, and § 703 [40–12–252] covers trailers, other than

---

**17.** Ala.Code § 40–12–255 (1975).

**18.** 2A *Sutherland Statutory Construction* § 45.-08 (4th ed. 1973).

**19.** *Id.*

**20.** *Id.*

**21.** *Id.*

**22.** "License" may be defined as a "right or permission granted in accordance with law by a competent authority ... to do some act." "Register" may be defined as "an official or formal enumeration, description or record of particulars." Webster's Third New International Dictionary (1976).

**23.** See n. 10 above.

house trailers, and semitrailers. These sections may be interpreted to mean that such "road" vehicles are registered for tax purposes and licensed for road use. From this, it can be convincingly argued that "mobile homes" *were* "motor vehicles" *required* to be registered for tax purposes but *not required* to be licensed for road use and, therefore, *not* "motor vehicles required to be licensed."

Several reasons have been given for allowing automatic perfection of purchase-money security interests in almost all consumer goods. Perfection in such a manner spares the filing system considerable burdens and saves creditors filing fees and innumerable trips to the courthouse for consumer-credit transactions.[24] The benefits gained from filing in most instances would be minimal since lenders are on guard when individuals attempt to borrow against consumer goods.[25] Finally, most consumer goods cost relatively little, depreciate quickly, and are seldom relied upon by creditors making loans.[26] These policy considerations do not fit automobiles, trucks, or mobile homes.[27]

It seems most likely to the Court that the legislature did not intend to exclude purchase-money security interests in mobile homes from the filing requirements of *U.C.C.* § 9–302(1), while including those in automobiles and trucks. This conclusion is, of course, not without some element of doubt; however, a contrary conclusion would be subject to a great deal more doubt, as no logical reason for exclusion of such a purchase-money security interest from the filing requirements of § 9–302(1) [or 7–9–302(1)] is suggested or suggests itself. The Court concludes that filing was required for the purchase-money security interests involved in these three cases.[28] Orders or judgments will be entered in harmony with this conclusion.

**24.** White & Summers, Uniform Commercial Code § 23–7 (2d ed. 1980).

**25.** *Id.*

**26.** *Id.*

**27.** *Id.* *Cf. Albany Discount Corp. v. Mohawk Natl. Bank,* 28 N.Y.2d 222, 321 N.Y.S.2d 94, 269 N.E.2d 809 (1971).

**28.** *In re Beard,* No. 79–37–5 (Bkrtcy.M.D.Ala., Aug. 16, 1979).